UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

KEITH EARL TELLINGHUISEN,

Petitioner,

v.

CONNIE ROEHRICH, Warden,

Respondent.

Civil No. 01-2013 (JEL/SRN)

**REPORT AND RECOMMENDATION**

Keith Earl Tellinghuisen, Minnesota Correctional Facility - Faribault, 1101 Linden Lane, Faribault, Minnesota, 55021-6400, Petitioner, pro se.

Wayne H. Swanson, Polk County Attorney, and Larry D. Orvik, Assistant Polk County Attorney, 223 East 7th Street #101, Crookston, Minnesota, 56716, for Respondent.

SUSAN RICHARD NELSON, United States Magistrate Judge

This matter is before the undersigned Magistrate Judge of the District Court on the petition of Keith Earl Tellinghuisen, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed a return, (Docket Nos. 7-9), contending that the petition should be denied. The matter has been referred to the undersigned for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons discussed below, the Court concludes that Petitioner's habeas corpus petition should be denied, and this action should be dismissed with prejudice.

## I. BACKGROUND

In April 1997, a Polk County jury found Petitioner guilty of kidnaping, burglary, making terroristic threats, assault, and violating a protection order. He was sentenced to 141 months in prison, and he is currently serving his sentence at the Minnesota

FILED SEP 13 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD_______
DEPUTY CLERK_______

Correctional Facility at Faribault, Minnesota.

Petitioner's convictions stem from a series of events that occurred during two nights in September 1996. On the night of September 14, 1996, Petitioner went to a Legion Hall with his girlfriend, Carla Parker. Sometime during that evening, Petitioner told Parker that if he ever caught her with another man, he probably would kill her. Parker became upset by Petitioner's threatening behavior that evening and left the Legion Hall without him. Petitioner later went to Parker's apartment to look for her, but when he arrived he found that only Parker's brother was there. The brother let Petitioner into the apartment, and Petitioner then became angry for some reason and started throwing dishes and other things. The police were called, and Petitioner was told to leave the apartment and not return. Although Petitioner did leave, he later returned and re-entered the apartment through a bedroom window. The police were called out again, and this time Petitioner was arrested.

Shortly thereafter, Parker obtained a protection order that directed Petitioner to stay away from her. On the night of September 24-25, 1996, however, Petitioner was back at Parker's apartment. Petitioner and Parker were arguing again that night, and Parker decided to leave for a while. She took her young daughter with her and went to a friend's home. When Parker and her daughter returned to their apartment, Petitioner was waiting for them. He locked them inside the apartment with him, and would not let them leave. When Parker tried to call the police, Petitioner broke the phones. During the next several hours, Petitioner repeatedly punched, choked and kicked Parker, threw things at her, threatened her with a knife, and burned her with a cigarette.

It was not until early the following morning that Petitioner was finally able to escape from her apartment and contact the police. The police took Parker to the hospital for treatment of her injuries. Petitioner was later arrested and charged with the various crimes for which he is now incarcerated.

A public defender named Joel Arnason was appointed to represent Petitioner at trial. On the morning when Petitioner's trial was scheduled to begin, Petitioner informed the judge that he was dissatisfied with Arnason's legal representation. The judge asked Arnason whether he was prepared to try the case, and Arnason said, without hesitation or qualification, that he was ready. (Trial transcript, [hereafter "Tr."], p. 3.[1]) The judge then invited Petitioner to explain why he was unhappy with Arnason, and Petitioner did so at length. (Id., pp. 4-6.) He said that Arnason had not taken a statement from him, Arnason had not sat down with him and gone through the evidence, Arnason had not shown any interest in defending him, and Arnason had suggested it would be counterproductive to call character witnesses to testify for the defense. (Id., pp. 4-5.) Petitioner concluded his explanation by saying "I just feel that he's not defending me adequately, you know, and I would request that I be assigned a different public defender." (Id., p. 5.)

The judge denied Petitioner's request for a new public defender, noting that "Mr. Arnason is a competent, very capable public defender," and "[y]ou are entitled to a public defender, but not a public defender of choice." (Id., p. 6.) A few minutes later, Petitioner told the judge that if he could not get a new public defender, he still wanted to discharge Attorney Arnason, even if that meant he would have to represent himself at trial. (Id., p. 7.)

---

[1] The transcript from Petitioner's trial is included in Respondent's Return, (Docket No. 9), at Appendix B.

When the judge asked Petitioner whether he really wanted to act as his own attorney, Petitioner said: "[W]ell, I don't know about defending myself. I would like to ask the court for a week continuance maybe in hopes of retaining a lawyer of my own." (Id.) The judge denied Petitioner's request for a continuance, and then asked him again whether he really wanted to represent himself. Petitioner ultimately decided against self-representation, stating -- "I suppose under the circumstances I have no other alternative but to continue being represented by Mr. Arnason, under duress." (Id., p. 11.) The case then proceeded to trial, and the jury found Petitioner guilty of several offenses.

Petitioner later filed a direct appeal in which he raised an insufficiency of the evidence claim. In a separate pro se brief, Petitioner also argued that he had received ineffective assistance of counsel at trial. The State Court of Appeals rejected Petitioner's insufficiency of the evidence claim, but refused to address his ineffective assistance claim, explaining that "[t]he present record includes too little information to permit us to assess the merits" of that claim. State v. Tellinghuisen, No. CX-97-1200, (Minn.App. 1998), 1998 WL 249029 (unpublished opinion) at *2. Although Petitioner was not granted any relief on his direct appeal, the Court noted that Petitioner was "not foreclosed from initiating post-conviction proceedings to permit exploration of his ineffective assistance of counsel claim." Id. Petitioner completed his direct appeal by seeking further review in the Minnesota Supreme Court, but his petition for review was denied on July 16, 1998.

On September 7, 1999, Petitioner filed a post-conviction motion in the trial court, in which he presented several claims for relief. He argued that the trial court judge erred by (i) not conducting a sufficient inquiry into the reasons for Petitioner's dissatisfaction with Attorney Arnason, (ii) denying Petitioner's request for a new public defender, and (iii)

denying Petitioner's request for a continuance, so that he could attempt to retain new counsel. Petitioner further argued that he was not provided adequate legal representation at trial, because Attorney Arnason did not consult with him before the trial started, did not contact any potential defense witnesses, did not adequately investigate the prosecution's witnesses, and did not withdraw from the case based on an alleged "conflict of interest."[2]

The trial court denied the post-conviction motion, and Petitioner then filed another appeal. In the post-conviction appeal, Petitioner argued that the trial court should have conducted an evidentiary hearing on his post-conviction motion. He further argued that (i) certain incriminating evidence should have been excluded at trial, (ii) he was deprived of his right to a fair trial by prosecutorial misconduct, and (iii) he received ineffective assistance of counsel at trial. The State Court of Appeals rejected all of those arguments, and upheld Petitioner's convictions and sentences once again. The Minnesota Supreme Court denied Petitioner's request for further review on September 25, 2001. State v. Tellinghuisen, No. CO-00-2089 (Minn.App. 2001), 2001 WL 799920 (unpublished opinion), rev. denied, September 25, 2001.

On November 5, 2001, Petitioner filed his current habeas corpus petition, which lists three grounds for relief:

(1) that Petitioner's constitutional rights were violated because the trial court did not conduct an adequate inquiry into the reasons for his dissatisfaction with his appointed counsel;

---

[2] Petitioner's state post-conviction motion is included in Respondent's return, (Docket No. 9), at Appendix K. His claims for relief are listed at Part V, (pp. 2-3), of that petition.

(2) that Petitioner's constitutional rights were violated because the trial court refused to appoint substitute counsel to represent him at trial; and

(3) that Petitioner's constitutional rights were violated because the trial court refused to grant him a continuance to give him a chance to retain a new attorney.

For the reasons discussed below, the Court finds that Petitioner is not entitled to a writ of habeas corpus on any of these claims.[3]

---

[3] The Court rejects Respondent's contention that the instant petition is time-barred under the one-year statute of limitations imposed by 28 U.S.C. § 2244(d)(1). According to Respondent's calculations, the statute of limitations was running in this case for a total of 460 days – 420 days between July 16, 1998, (when the Minnesota Supreme Court denied Petitioner's request for further review on direct appeal), and September 7, 1999, (when Petitioner filed his state post-conviction motion), plus another 40 days between September 25, 2001, (when the State Supreme Court refused to review Petitioner's post-conviction claims), and November 5, 2001, (when his current petition was received by the Clerk of Court). However, Respondent's argument does not take into account two critical factors. First, the statute of limitations does not begin to run following a direct appeal until after the deadline for seeking certiorari review in the United States Supreme Court. Smith v. Bowersox, 159 F.3d 345 (8th Cir. 1998) (state criminal convictions are not final for statute of limitations purposes until the deadline for seeking certiorari has expired), cert. denied, 525 U.S. 1187 (1999). Second, prisoners seeking habeas corpus relief are entitled to the benefit of the "mailbox rule," which means that a habeas petition is deemed to be filed, and the statute of limitations stops running, as of the date when a prisoner gives his petition to prison officials for mailing. Nichols v. Bowersox, 172 F.3d 1068, 1077 (8th Cir. 1999). Therefore, in the present case, the statute of limitations did not begin to run until October 16, 1998, (the day after the 90-day deadline for seeking certiorari review in the U.S. Supreme Court), and the statute of limitations stopped running no later than November 1, 2001, (the date of the post-mark on the envelope containing Petitioner's current petition).

By the Court's calculations then, the statute of limitations ran for a total of only 363 days -- 327 days between October 16, 1998, (the date when Petitioner's conviction became final on direct review, following the expiration of the time for seeking certiorari review), and September 7, 1999, (the date when Petitioner filed his state post-conviction motion), plus another 36 days between September 25, 2001, (when the Supreme Court refused to review Petitioner's post-conviction claims), and November 1, 2001, (when the current petition is deemed to have been filed pursuant to the mailbox rule). Thus, the Court concludes that the instant petition is not time-barred.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") sets forth the standards that govern this Court's review of habeas corpus petitions filed by state prisoners. The relevant portion of the AEDPA, 28 U.S.C. § 2254(d), provides that:

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court discussed the meaning of this statute, and how it should be applied by the federal district courts. The Supreme Court recognized that

> "a state-court decision can be 'contrary to' this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours."

Id. at 405.

> "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

Id. at 413.

The Court also explained that

> "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.... [¶] [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

Id. at 409, 411 (emphasis added).

A writ of habeas corpus may also be available where the state courts' resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In other words, habeas relief can be granted if the conviction is based on findings of fact that could not reasonably be derived from the evidentiary record. When reviewing a state court decision, however, "a federal court... presumes that the state court's factual determinations are correct," and that presumption "may be rebutted only by clear and convincing evidence." Lee v. Gammon, 222 F.3d 441, 442 (8th Cir. 2000).

Needless to say, a federal district court is not allowed to conduct its own de novo review of a prisoner's constitutional claims. Habeas relief cannot be granted unless the prisoner has identified, and substantiated, a specific error committed by the state courts. Moreover, he must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted by the Supreme Court in Williams.

## III. DISCUSSION

### A. Adequate Inquiry Claim

Petitioner initially contends that his convictions should be vacated because the trial court did not try to find out why he was dissatisfied with his appointed defense counsel, Mr. Arnason. This claim is rejected for two reasons.

First, the trial court did, in fact, ask Petitioner why he was dissatisfied with his attorney. When Petitioner's concerns were brought to the trial judge's attention, the judge gave him an unfettered opportunity to explain why he did not want to be represented by Attorney Arnason. The record shows that the trial judge let Petitioner explain, at length and without interruption, why he was unhappy with Arnason. The record also shows that Petitioner was able to articulate his concerns reasonably well, and that he was able to tell the judge why he thought Arnason was not acting in his best interests. If Petitioner believes there was some particular flaw in the judge's inquiry, he has not identified what that might be. Petitioner obviously is disappointed with the trial judge's response to his complaints about his attorney, but it cannot be said that the judge failed to conduct an inquiry. Again, Petitioner simply has not shown that the trial court neglected to find out why he was he was dissatisfied with Attorney Arnason.

In addition, Petitioner has failed to show that the state courts' resolution of his "adequate inquiry claim" was contrary to, or involved an unreasonable application of, any rule of federal law recognized by the United States Supreme Court. Indeed, Petitioner has not even mentioned any Supreme Court decision in his petition.

In his state post-conviction appeal, Petitioner did cite one U.S. Supreme Court decision, Holloway v. Arkansas, 435 U.S. 475 (1978), that he apparently believes is relevant to his adequate inquiry claim. In Holloway, the Supreme Court held that "where the trial court is made aware of a potential conflict of interest" between a criminal defendant and his attorney, "the trial court has a duty to conduct a searching inquiry into the possibility of a constitutional violation arising from that conflict." Caban v. United States, 281 F.3d 778, 781 (8th Cir. 2002).

Holloway is not relevant to this case, however, because there is nothing in the record to suggest that there ever was any genuine "conflict of interest" between Petitioner and Attorney Arnason. According to Petitioner, there was a personality conflict in the attorney-client relationship, but there is no indication of any divided loyalty on the part of the attorney. Petitioner may have disliked his attorney, he may have disagreed with his attorney's trial strategy, and he may have believed that his attorney was doing a poor job, but he has not shown (or even alleged) that his attorney's interest in defending him was affected by any extraneous factor. There is no indication, for example, that Arnason was representing a co-defendant whose interests were different from Petitioner's, that Arnason was representing (or had in the past represented) the victim or any adverse witness, that Arnason's representation was affected by any financial considerations, or that Arnason had any type of inappropriate relationship with the prosecutor's office.

The important distinction between a genuine conflict of interest and other types of conflict within an attorney-client relationship was recognized by our Court of Appeals in Owsley v. Bowersox, 234 F.3d 1055 (8th Cir. 2000), cert. denied, 122 S.Ct. 233 (2001) – a case very similar to this one. In Owsley, a state habeas petitioner alleged that "an irreconcilable conflict arose between him and his court-appointed counsel," and that "there was a complete breakdown in communications" which caused the attorney to be "incapable of defending [the petitioner] effectively." Id. at 1057. He further alleged that his attorney "neglect[ed] to meet and consult with him about his defense, fail[ed] to conduct all requested investigations, [spoke] to him in a condescending fashion, and call[ed] him a profane name." Id. In other words, the Owsley petitioner's complaints about his attorney were almost exactly the same as those raised by the instant Petitioner.

In Owsley, the Court of Appeals concluded that the petitioner could not be granted habeas corpus relief, because he was unable to show that the state courts handled his complaints about his attorney in a manner that was contrary to, or involved an unreasonable application of, any United States Supreme Court decision. Id. (petitioner's "claims must be rejected because he cannot provide us with any Supreme Court opinion justifying his position"). The Court found that Holloway and other related cases were inapplicable, because they involved "conflicts of interest that arise when an attorney represents multiple defendants in the same case," while the petitioner in Owsley, (like Petitioner here), presented only "complaints about his personality conflicts with his counsel." Id. See also Mickens v. Taylor, 122 S.Ct. 1237, 1241-42 (2002) ("Holloway... creates an automatic reversal rule only where defense counsel is forced to represent co-defendants over his timely objection").

Here, as in Owsley, Petitioner is not entitled to a writ of habeas corpus because he has not shown that the state courts' resolution of his complaints against Attorney Arnason is based on a misinterpretation or misapplication of any constitutional principle recognized by the Supreme Court. Petitioner's current claim, like the claim presented in Owsley, is not based on any genuine conflict of interest. What Petitioner has characterized as a "conflict of interest" is really nothing more than a conflict of personalities, a conflict over trial strategies, and a conflict about the adequacy of the attorney's legal representation. Because Petitioner has not shown any true conflict of interest, i.e., a conflict causing divided loyalty, Holloway is not applicable and will not support his current habeas petition. Thus, the Court concludes that in this case, as in Owsley, the state courts' resolution of the adequate inquiry claim is not inconsistent with any Supreme Court precedent.

B. Substitution of Counsel Claim

Petitioner's second claim for relief is closely related to the first. He contends that the trial court's initial error, (i.e., the alleged failure to conduct an adequate inquiry), was compounded by the trial court's refusal to appoint substitute counsel to represent him. The Minnesota Court of Appeals decided Petitioner's substitution of counsel claim as follows:

> "The Minnesota Constitution and the United States Constitution provide indigent defendants with the right to counsel in all criminal proceedings.... [Citation omitted.] A defendant, however, does not have an absolute constitutional right to the counsel of his choice.... [Citation omitted.] The trial court is obligated to provide an indigent defendant with a capable attorney, but the defendant must accept the appointee.... [Citation omitted.] A request for substitute counsel 'will be granted only if exceptional circumstances exist and the demand is timely and reasonably made.'... [Citation omitted.] [Petitioner] has not alleged facts that constitute the exceptional circumstances necessary to entitle him to substitute counsel."

Tellinghuisen, 2001 WL 799920 at *3.

Petitioner has failed to explain how the state appellate court's adjudication of his substitution of counsel claim is contrary to, or involved an unreasonable application of, established federal law. Nor has he shown that state court's resolution of that claim was based on an unreasonable determination of the facts. Indeed, the Minnesota Court of Appeals' analysis of Petitioner's substitution of counsel claim is wholly consistent with the Eighth Circuit's rulings on similar claims.

Our Court of Appeals has held that "[a] criminal defendant does not have the absolute right to counsel of his choosing," (Carey v. State of Minnesota, 767 F.2d 440, 441 (8th Cir.), cert. denied, 474 U.S. 1010 (1985)) and that "[s]ubstitution of counsel is a matter committed to the sound discretion of the trial court," (Nerison v. Solem, 715 F.2d 415, 418 (8th Cir. 1983), cert. denied, 464 U.S. 1072 (1984)).

> "Requests by criminal defendants for new counsel raise difficult issues requiring courts to weigh conflicting factors -- the need to ensure effective legal representation, the need to thwart abusive delay tactics, and the reality that a person accused of [a] crime is often genuinely unhappy with an appointed counsel who is nonetheless doing a good job. Because of these tensions, the standards for granting substitute counsel are strict:....
>
>> 'To warrant substitute counsel, a defendant must show justifiable dissatisfaction with appointed counsel [such as] a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant. The defendant's right to counsel, however, does not involve the right to a 'meaningful relationship' between an accused and his counsel.'"

Hunter v. Delo, 62 F.3d 271, 274 (8th Cir. 1995), quoting United States v. Swinney, 970 F.2d 494, 499 (8th Cir.), cert. denied, 506 U.S. 1011 (1992) (citations omitted).

Just recently, the Eighth Circuit reiterated that:

> "When faced with a motion to appoint substitute counsel, the district court must balance several factors, including 'the need to ensure effective legal representation, the need to thwart abusive delay tactics, and the reality that a person accused of crime is often genuinely unhappy with an appointed counsel who is nonetheless doing a good job.' [Hunter, 62 F.3d at 274.] The court must conduct an adequate inquiry into the nature and extent of an alleged breakdown in attorney-client communications. Id. at 275. The focus of the justifiable dissatisfaction inquiry is the adequacy of counsel in the adversarial process, not the accused's relationship with his attorney. See Wheat v. United States, 486 U.S. 153, 159... (1988). 'Last minute requests to substitute defense counsel are not favored.' United States v. Klein, 13 F.3d 1182, 1185 (8th Cir.), cert. denied, 512 U.S. 1226... (1994)."

United States v. Barrow, 287 F.3d 733, 738 (8th Cir. 2002).

Thus, the critical issue confronting the state courts in this case was not whether Petitioner was content with his attorney, but whether he had demonstrated that his attorney was incapable of providing an adequate defense. Both the trial court and the state appellate court found that Petitioner had shown only that he had a personality conflict with his attorney, and that he disagreed with the attorney's plans and preparation for his trial.

The state courts concluded that Petitioner's reasons for being dissatisfied with his attorney were not sufficient to warrant a substitution of attorneys.

It must be remembered that the AEDPA "'mandates a deferential review of state court decisions.'" Boyd v. Minnesota, 274 F.3d 497, 500 (8th Cir. 2001), quoting James v. Bowersox, 187 F.3d 866, 869 (8th Cir. 1999), cert. denied, 528 U.S. 1143 (2000). It does not matter whether the federal court agrees or disagrees with the state court's analysis; a writ of habeas corpus can be granted only if the state court's resolution of the petitioner's claim "cannot reasonably be justified under existing Supreme Court precedent." Boyd, 274 F.3d at 500 (citations omitted). Petitioner has not shown that the federal legal principles pertaining to his substitution of attorney claim (quoted at length above) were applied by the state courts in an unreasonable manner. Nor has Petitioner shown that the state courts made an unreasonable determination of the facts relevant to that claim. Thus, the Court concludes that Petitioner is not entitled to a writ of habeas corpus on his substitution of attorney claim.

C. Request for Continuance Claim

In his final claim for relief, Petitioner contends that the trial court erred by failing to grant him a continuance so he could attempt to retain a new attorney on his own. In Morris v. Slappy, 461 U.S. 1 (1983), the Supreme Court pointed out that

> "[t]rial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons."

Id. at 11. "Consequently," the Court held in Morris, "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon

expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." Id. at 11-12, quoting Ungar v. Sarafite, 376 U.S. 575, 589 (1964) (emphasis added).

In this case, the Court cannot find that the trial court judge acted unreasonably or arbitrarily when he denied Petitioner's last minute request for a continuance. The trial judge listened to Petitioner's complaints about his attorney and found they did not warrant appointment of new counsel. The trial judge assured himself that Petitioner's counsel was ready to try the case, and he undoubtedly considered the adverse effects of postponing a trial that was all set to begin.

Furthermore, Petitioner has offered no reason to believe that a continuance would have served any useful purpose. Respondent argues that –

> "Petitioner was already incarcerated on other charges at a State correctional facility, and had no income to fund private counsel. The Petitioner has never indicated how a continuance would have allowed him to obtain other counsel given these circumstances."

(Respondent's Memorandum, [Docket No. 8], p. 22.) Petitioner has not contradicted this argument, and the Court finds it to be very persuasive. The only reason Petitioner offered in support of his request for a continuance was "maybe in hopes of retaining a lawyer of my own." (Tr. P. 7.) However, Petitioner has provided no reason to think that he actually could have retained a private attorney to represent him, and his futile "hopes" alone did not justify a postponement of the trial.

In sum, Petitioner has not shown that the trial court arbitrarily and unreasonably denied a well-justified request for a continuance. He has therefore failed to show that the trial court's ruling on the continuance request was contrary to the Supreme Court's

construction of applicable constitutional principles. Thus, Petitioner's third claim for relief must also be denied.[4]

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Petitioner's application for leave to proceed in forma pauperis, (Docket No. 2), be DENIED AS MOOT; and

2. Petitioner's application for habeas corpus relief under 28 U.S.C. § 2254, (Docket No. 1), be DISMISSED WITH PREJUDICE.

Dated: September 13, 2002

Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this report and recommendation by filing with the Clerk of Court and serving all parties, within ten days after being served with a copy thereof, written objections which specifically identify the portions of the proposed findings, recommendations or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief with ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

---

[4] The Court notes that Petitioner's habeas corpus petition was accompanied by an application to proceed in forma pauperis, ("IFP"), pursuant to 28 U.S.C. § 1915(a). (Docket No. 2.) However, Petitioner has paid the full $5 filing fee for this action, and he has not shown that he needs IFP status for any reason other than to be excused from paying the filing fee. It will therefore be recommended that Petitioner's IFP application be denied as moot.